JUDGE OETKEN

Daniel J. Kaiser [DK-9387]
KAISER SAURBORN & MAIR, P.C.
111 Broadway, Suite 1805
New York, New York 10006
(212) 338-9100



**12 CIV 6618**

Attorneys for plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------

JOSEPH BEJJANI, HENRY BOLEJSZO,
ALAIN BREDA, AHMAD BULLA,
GEOFFREY HABERER, RUHEL HASSAN,
RICKY GARCIA, ABDELKABIR KAHTANE,
MOHAMMED KHANFRI, KATHY KRINKE,
STYLIANOS LOUKISSAS, ERICH LUNZER,
JAIRO MARTINEZ, EDILBERTO MORCOS,
JOHN O'CONNOR, AART VAN DERLAAN, and
OSCAR FLORES,

Civil Action No.:

**COMPLAINT**

**TRIAL JURY DEMANDED**

Plaintiff,

– against –

MANHATTAN SHERATON CORPORATION
d/b/a ST. REGIS HOTEL, and NEW YORK HOTEL
AND MOTEL TRADES COUNCIL, AFL-CIO,

Defendants.

------------------------------------------------------------------

Plaintiffs, by their attorneys, Kaiser Saurborn & Mair, P.C., allege for their complaint as

follows:

## SUMMARY OF ACTION

1.      This civil action seeks remedies for an overt conspiracy between the St. Regis

Hotel ["The Hotel"] and the New York Hotel and Motel Trades Council, AFL-CIO ["The

Union"] to undermine a settlement agreement ["Settlement Agreement"] that resolved a civil

action filed in this court against the Hotel and the Union alleging breaches by the Union of the

1

duty of fair representation and breach of contract by the Hotel. The prior action sought to compel the Union and Hotel, among other things, to abide by an arbitration decision requiring the payment to the Plaintiffs ["Banquet Servers"] of gratuities on the revenue generated from room rental and other fees associated with banquet events. The settlement agreement resolved those claims. Since the filing of the prior action, both the Hotel and Union have engaged in conduct purposefully designed to deprive the banquet servers of the full benefits of the Settlement Agreement, and in turn, the arbitration award it was intended to enforce. The Banquet Servers first learned of this conspiracy on or about August 1, 2012.

2.      This action alleges breach of the duty of fair representation by the Union and breach of the Collective Bargaining Agreement and Settlement Agreement by the Hotel.

## PARTIES, VENUE, AND JURISDICTION

3.      This Court has jurisdiction over the subject matter of this action of this complaint under Section 301(A) of the Labor Management Relations Act, 29 U.S.C. 185 (a), and under 28 U.S.C. 1331 and 1337.

4.      Venue lies within the jurisdiction of this court pursuant to 28 U.S.C. 1331 and 1337.

5.      Plaintiffs are Banquet Servers employed by defendant Hotel under the terms and conditions of the Collective Bargaining Agreement existing between the Hotel and the Union.

6.      Joseph Bejjani is a Banquet Server employed by the Hotel and a member of the Union.

7.      Henry Bolejszo is a Banquet Server employed by the Hotel and a member of the Union.

8.      Alain Breda is a Banquet Server employed by the Hotel and a member of the

2

Union.

9.    Ahmad Bulla is a Banquet Server employed by the Hotel and a member of the Union.

10.    Geoffrey Haberer is a Banquet Server employed by the Hotel and a member of the Union.

11.    Ruhel Hassan is a Banquet Server employed by the Hotel and a member of the Union.

12.    Ricky Garcia is a Banquet Server employed by the Hotel and a member of the Union.

13.    Abdelkabir Kahtane is a Banquet Server employed by the Hotel and a member of the Union.

14.    Mohammed Khanfri is a Banquet Server employed by the Hotel and a member of the Union.

15.    Kathy Krinke is a Banquet Server employed by the Hotel and a member of the Union.

16.    Stylianos Loukissas is a Banquet Server employed by the Hotel and a member of the Union.

17.    Erich Lunzer is a Banquet Server employed by the Hotel and a member of the Union.

18.    Jairo Martinez is a Banquet Server employed by the Hotel and a member of the Union.

19.    Edilberto Morcos is a Banquet Server employed by the Hotel and a member of the Union.

20.     John O'Connor is a Banquet Server employed by the Hotel and a member of the Union.

21.     Aart Van Derlaan is a Banquet Server employed by the Hotel and a member of the Union.

22.     Oscar Flores is a Banquet Server employed by the Hotel and a member of the Union.

23.     The Union is a labor organization within the meaning of Section 301(a) of the LMRA, 29 U.S.C. 185 (a) and 29 U.S.C. 152. The Union represents, for the purposes of collective bargaining persons employed, inter alia, as Banquet Servers in the hotel industry in New York and specifically represents plaintiffs for purposes of collective bargaining and for enforcement and implementation of the terms of the CBA. The Union's principal office is located at 709 Eighth Avenue, New York, New York 10036.

24.     The Hotel, Manhattan Sheraton Corporation d/b/a as St. Regis, employs Banquet Servers represented by the Union in the hotel industry which is an industry affecting interstate commerce, and is an employer within the meaning of Section 301 (a) of the LMRA, 29 U.S.C. 185 (a) and Sections 501 (1) and (3) of the LMRA, 29 U.S.C. 142 (1) and (3) and 29 U.S.C 152 (2). The Hotel's principal place of business is Two East 55th Street, New York, New York 10022.

## BACKGROUND FACTS

### The Prior Action Against the Hotel and the Union

25.     On November 30, 2007, plaintiffs filed pro se civil complaint 07CV10729 in this Court alleging breaches of the duty of fair representation by the Union and breach of the Collective Bargaining Agreement ["CBA"] by the Hotel. ["prior action"]

4

26.     On January 11, 2008, the Union and the Hotel executed an agreement related to the Hotel's Restaurant "Adour" ("Adour Agreement").  The Adour agreement extended the CBA, also referred to as the Industry Wide Agreement ("IWA"), to effectively give the Hotel full banquet rights at its 'A La Carte' restaurant, while exempting it from banquet pay rates and other terms and conditions of employment for banquet personnel.

27.     The Banquet Servers did not become aware of the Adour Agreement until August 1, 2012.

28.     The Servers pay rates authorized by the Adour Agreement are much reduced from those of banquets under the IWA, thereby creating a de facto competitive second banquet department within the Hotel which effectively makes the plaintiffs secondary banquet servers.

29.     The purpose of the Adour Agreement is to undermine the Banquet Servers entitlement to gratuities and wages at the rate required by the CBA and the arbitration award by shifting banquet events to the restaurant where the service pay rates are much lower by consent of the Union not subject to the wages and gratuity rates set forth in the CBA and the Settlement Agreement.

**The Settlement Agreement Between the Union and The Hotel**

30.     The civil complaint was ultimately settled.  The Settlement Agreement was executed on September 8, 2008.

31.     At no time during the settlement negotiations were the servers or their attorney appraised of the existence of the Adour Agreement either by the Union or the Hotel.

32.     Plaintiffs' attorney was present at all the negotiations meetings which produced the Settlement Agreement.

33.     The Adour Agreement materially impacted upon the value of the settlement

5

agreement to the Banquet Servers and the Union and Hotel purposefully concealed its existence from the Banquet Servers thereby misleading the Banquet Servers as to what they were agreeing to settle.

34.     In furtherance of their conspiracy, the Union and the Hotel caused the following language in the Settlement Agreement:

> The Union acknowledges that there are no other banquet grievances of which it is has knowledge, or of which it should have knowledge, as of the date of the Omnibus Agreement. [...]

35.     Plaintiffs bargained for and obtained an absolute protection forbidding the Hotel from reducing any of their income benefits.  The Settlement Agreement states in the paragraph following the aforementioned one:

> Nothing in this Omnibus Agreement or Settlements Agreements shall be interpreted to authorize the Hotel to reduce any benefits currently received by tipped banquet employees, except as may be set forth in the Omnibus Agreement or the attached Settlement Agreements.

36.     The Settlement Agreement then qualifies the aforementioned protection to existing practices.  The Settlement Agreement continues:

> Accordingly, the parties agree that, except as modified by the Banquet Settlements and this Omnibus Agreement, [...] the work and pay practices of the Hotel's Banquet Department are consistent with the IWA, decisions of the Office of the Impartial Chairperson and applicable law.

37.     Upon Information and Belief, The Union and Hotel at the time the settlement agreement was executed agreed that they would cooperate to intentionally undermine the agreement by taking actions to minimize the benefits that were provided to the Banquet Servers by the Settlement Agreement. The Adour Agreement, in particular, and its implementation

materially diminishes the benefits of the Settlement Agreement and undermines its purpose and intent.  If the plaintiffs had been aware of the Adour Agreement prior to executing the settlement agreement, they would not have agreed to the Settlement Agreement's terms in the form that it was executed.

**The Union and the Hotel Cooperate to Intentionally**
**Undermine the Settlement Agreement**

38.    While maintaining a total secrecy about the Adour agreement, the Union and the Hotel, working in concert, began to create and/or enhance practices unknown to plaintiffs, and to execute a plan to make the practices permanent in order to effectively erode plaintiffs' income and the benefits to which the Arbitration Award and Settlement Agreement entitled them.

**Hotel Diverts Plaintiffs Income to Room Service Servers**

39.    Subsequent to the execution of the settlement agreement, the Hotel increasingly began to divert banquet events normally serviced by the banquet servers to Hotel rooms by removing beds and "converting" the rooms into banquet rooms. The Hotel staff, Room Service servers, that services the Hotel rooms are compensated at a much lower rate.

40.    Each time the Banquet Servers questioned the legal appropriatness of this practice, The Union conceded that practice violated the CBA but did not take any meaningful steps to address the violation which was part of the on-going conspiracy to undermine the Settlement Agreement and evade the consequences of the arbitration award.

41.    While this practice blatantly violated the terms of the Settlement Agreement, the Union did nothing to challenge it and acquiesced in it because it wanted the benefits of the Settlement Agreement undermined.

42.    While the Union occasionally made statements that they were seeking information

from the Hotel concerning the practice, those statements turned out to be blatant misrepresentations.

43.     The Union at no time sought any material information from the Hotel concerning this practice.

44.     At a meeting held on February 29, 2012, Plaintiff Bejjani, a Union delegate, raised, among other things, a function specific claim referring to a two-day banquet meeting event which took place on December 5, and December 6, 2011.

45.     In addition to the banquet space used on a banquet floor, the event used additional bedrooms converted to meeting rooms on the Hotel floors.

46.     Bejjani claimed that the actual number of guests who attended the event on the banquet floor and serviced by the banquet servers was substantially higher than the number of guests charged to the client by the Hotel.

47.     The Hotel had declined to pay contractual compensation to banquet servers based on the number of guests serviced, on the grounds that it cannot charge the client twice, and that the client was already charged on the Hotel floors. .

48.     Normally, all the guests attending a banquet event that branches out into the Hotel floors will have to use the banquet space because this is where the main event takes place.

49.     Six servers lost contractual obligations on this two day event.  Three of them attended the meeting of February 29, 2012.

50.     Even though the Union conceded this practice violated the CBA, the Union refused to arbitrate the issue which is described in paragraphs 44 through 49.

51.     The Union vice president and business agent assigned to the Hotel ("Cedeno") volunteered at this meeting that there was a recent favorable arbitration decision which sides

with banquets against room service regarding service of banquet functions on the guest floors.

52.     Cedeno then instructed the Hotel to arrange a meeting with the room service servers to advise them of the new arbitration decision, offer to them the opportunity to work out a solution with the banquet servers.  Should they refuse, Cedeno instructed the Hotel to begin employing banquet servers on the hotel floors

53.     The "instruction" to the Hotel was a sham and intentional cover for a practice that the Hotel and the Union had conspired to continue for the express purpose of undermining the Settlement Agreement.

54.     The Union took no actions to remedy this practice that they knew undermined the income of the Banquet Servers and undermined the Settlement Agreement.

55.     A follow up meeting was set for March 12, 2012.

56.     Bejjani asked Cedeno for a copy of this new arbitration, and the decision was promptly emailed that same afternoon.

57.     The emailed decision turned out to be that of the London Hotel NYC  dated April 19, 2011 which was already in existence, and which had been withheld from a meeting which was  held on April 28, 2011.

58.     On March 9, 2012, the Director of Banquet Services, ("Najemian"), notified Bejjani that the meeting scheduled for March 12, 2012, had been rescheduled for March 21, 2012.

59.     On March 13, 2012, the Union called Bejjani to cancel the March 21, 2012 meeting until further notice.

60.     The call revealed that the caller ("Hansen") is Cedeno's assistant, that Peter Ward ("Ward"), President of the Union, was sending Cedeno to D.C. on official Union business that

9

evening, that Cedeno's return date was unknown, and that the initial follow up meeting which was set for March 12, 2012, was cancelled by the Hotel.

61.     Hansen could not provide a substitute for Cedeno to keep the March 21, 2012 meeting alive, and stated that as soon as Cedeno's return date becomes known, either Hansen or Cedeno will be giving Bejjani a call to get the meeting rescheduled.

62.     As echoes resounded at the Hotel that Cedeno had been back, delegate Morcos placed a few calls to Cedeno's cell phone.  None of the calls were returned.

63.     On June 13, 2012, plaintiff O'Connor came across Cedeno at the Hotel.

64.     O'Connor spoke to Cedeno, among other things, regarding the delay about the hotel floors issue in light of the new arbitration decision which says that the floors belong to banquets.

65.     Cedeno responded to the effect that Plaintiff Bejjani was misinterpreting that decision.

66.     The decision which O'Connor referred to is the London Hotel NYC decision.

67.     On July 10, 2012, Plaintiffs' lawyer, in a letter sent to the Union General Counsel ("Maroko") wrote:

> Dear Mr. Maroko:
>
> My clients have recently informed me that since the time of the settlement of the room rental gratuity litigation etc, the Hotel has systematically made concerted efforts to evade its obligations under the signed settlement agreement.
>
> Among assortment of duplicitous conduct, in particular the Hotel has over time converted bedroom floors to banquet facilities in order to deny banquet staff this work. The Hotel's motivation of course is to be able to utilize the room service staff at much reduced rates. The Hotel's conduct, however, blatantly violates the Collective Bargaining Agreement, as arbitrators have already ruled

10

in several decisions, as well as the executed settlement agreement.

Most troubling, the Hotel's violations appear to be occurring with the acquiescence of the Union. My clients over an extended period of time have attempted to negotiate a solution to these violations with no success. The Union is not willing to intercede on their behalf even to rectify the most blatant of the Hotel's violations.

As a matter of urgency, I propose that the Union and the Hotel sit down with my clients and explore and agree upon a path forward. Otherwise, my clients will resort to the Courts as before and contentious litigation will begin anew.

68.     The letter was sent via FEDEX and it was received by the Union on the morning of July 11, 2012.

69.     On the morning of July 13, 2012, Cedeno left this message on Bejjani's home phone stating: "Joe, this is Eddie Cedeno from Local 6. Give me a call, I want to set up follow up meetings and I want to speak to you. Give me a call please".

70.     Bejjani returned Cedeno's call within 40 minutes and the call was not picked up.

71.     On the afternoon of the same day, July 13, 2012, the Union ("Clarke") called Bejjani and a follow up meeting was set up for August 1, 2012. As an explanation to this distant date, Clarke stated that some Hotel manager was not available before that date. Bejjani had never heard of Clarke at that stage.

72.     On July 18, 2012, the Union ("Tremonti") faxed a response to plaintiffs' attorney's letter of July 10, 2012. The letter stated:

Dear Mr. Kaiser:

Your July 10, 2012 letter addressed to Richard Maroko was forwarded to me for response. The Union is currently looking into this matter further and has sent requests for information to the Hotel. If your clients have any further questions or concerns, they can contact their business agent, Eddie Cedeno, or myself at 212.957.8000.

11

73.     The Union, however, took no substantive actions to "investigate" anything since it knew full well what was happening and supported the actions.

74.     On July 30, 2012, Bejjani addressed Ward via overnight mail in response to Tremonti's letter. The letter stated:

> Dear Mr. Ward,
>
> This is in response to the July 18, 2012 Union letter by Ms. Amy Tremonti (Tremonti) to Mr. Daniel Kaiser. I am sure you are personally always fully aware of all the facts concerning Banquets at the St. Regis, so I will make this fast and clear without going into much detail.
>
> On the morning of July 11, 2012, you, the Union received a FedEx letter from Mr. Kaiser generally alleging duplicity and misrepresentation by the Union in relation to our grievances regarding violations of our 2008 agreement as well as the Collective Bargaining Agreement (CBA), and urging for an immediate meeting to resolve the issues.
>
> On July 13, 2012, the Union called me twice ultimately setting up an August 1st meeting with the Hotel. What was somewhat disturbing however is the Union essentially characterizing the meeting as a "follow up" to the February 29, 2012 meeting with the Hotel. More disturbing was the subsequent letter by Tremonti claiming investigation of our claim by requesting information from the Hotel, asking us to address our concerns to our business agent, Mr. Cedeno (Cedeno) or her. This shows that the Union remains in its deceptive game playing mode which has plagued us for the last 21 years, ever since the St. Regis reopened in 1991, warranting this response to you directly.
>
> At the February 29, 2012 meeting with the Hotel, a follow up meeting was scheduled for the following week. The Hotel later notified me that the meeting was put off for another week, and a few days later the Union advised me that Cedeno will be out on Union Business in Washington, D.C. and that he will contact me in two weeks to reschedule. The Union declined to provide a different Agent to move forward without delay. Four months lapsed without any development even though Cedeno was seen at

the Hotel on a number of occasions.   Calls to Cedeno by the
Assistant Delegate, Mr. Edilberto Morcos went ignored.  A similar
pattern of avoidance was also used the previous year on related
issues.   The follow up that ultimately took place months later
appeared to be a short rehearsed meeting where Cedeno said he
would file for arbitration.  The Hotel advised us a couple of weeks
later that it had received a request for information in relation to this
arbitration.  The Union never mentioned the arbitration again, but
we ultimately learned independently that a request for arbitration
was never filed.  There are other related, disturbing and deceptive
facts which I will not mention here for the purpose of keeping this
document short and to the point.

I am now convinced by these recent developments that we are on a
"bridge to nowhere."  An analysis of our 21-year old record of
having to practically resort to drastic measures towards the Union
to get violations resolved, leaves me with only one conclusion.
The deal which you brokered with the Hotel to get me hired in
1991 must have contained a promise by the Union to compromise
the CBA in return.  I now see that the 'hand shake' agreement
between the Union and the Hotel referred to by both entities during
our several year quest to exit the 'tip pool', must have been much
broader than just a 'tip pool' agreement.   We lost millions of
dollars in the 17 years of duplicity which culminated in our 2008
agreement.

Had I known back in 1991 what I know now, I would have
declined the corrective action taken by you to get me hired after
the harm you had caused me while I was still a non union member.
I would have declined the position and taken you to task then.  I
would have thus avoided many stressful years.  The hours and
energy I spent fending off the attacks on me by the Hotel and the
Union for attempting to enforce the CBA (though obviously
characterized otherwise) would have been used in a more positive
and profitable manner for myself.  It goes without saying that the
word "attacks" should not be limited to the 'demeaning and
degrading swipes', but should certainly include my having been
branded and treated as a second class employee.   21 years is
enough.   I know deep down that you are personally behind the
events and the dramas aimed at our defeat at the Hotel because of
the debt you owe to the Hotel, so I now bluntly ask you to stop this
behavior immediately.

I believe the meeting scheduled for August 1st will be another
fraudulent show to make it appear that you are fulfilling your legal

duties towards us. I am not interested in such a meeting. Please see to it that this meeting will be what we asked for, a truly substantive one aimed at finding real, acceptable solutions to the issues by all parties. I believe this path will avoid severe headaches to all involved and allow us all to focus on more positive issues going forward.

I take this opportunity to congratulate you on the recent 7-year contract, and do look forward to the day, hopefully in the not too distant future, when we can finally have a long lasting good relationship.

Because of the sensitive contents of this letter, I will only provide a privileged copy to Mr. Kaiser.

75.    On August 1, 2012, a Human Resources Executive, ("Lau"), acted surprised when delegate Bejjani, Plaintiff O'Connor, and delegate Morcos, showed up for the meeting. Lau stated that the Director of Banquets, ("Merjian"), was not available. Lau admitted that Merjian was at the Hotel after July 13, 2012. This was the date when Clarke stated that the meeting cannot be held before August 1, 2012 because some manager was not available before then. Lau identified Merjian to be that manager.

76.    The meeting turned into a Union meeting, and management was invited towards the end of the meeting for the purpose of requesting additional documents from the Hotel. At that meeting, it was announced that Clarke had just become the new Union business agent for the St. Regis, that Cedeno, who is already a vice president, would be leaving the St. Regis in a promotional move. Cedeno assured the delegates and plaintiff O'Connor, however, that he personally will continue to handle plaintiffs' case, in a reassuring tone that plaintiffs have gotten the best.

77.    At the meeting Cedeno made many material false statements including statements regarding the history of the issues. Certain previous meeting dates were claimed to have

contained facts that belonged to other meeting dates which appeared to have been suppressed completely.

78.     The Union continues to refuse to file an arbitration demand concerning the practice of using Hotel rooms for Banquet events and generally the Hotel's practice of the diversion of banquet server income.

79.     The Union refuses to meet and confer with the Banquet Servers in good faith to discuss the issue always inventing excuses for its inaction.

80.     Upon Information and Belief, The Union wants this practice to continue and intensify so that its goal of undermining the benefits of the Settlement Agreement is realized.

81.     It is clear that the Union has no intention to honestly arbitrate plaintiffs' claims.  It insists on waiting for the records so it can arbitrate the hotel's position, and perhaps, arbitrate nothing at all, once it can feel comfortable in asserting a timeliness defense in Court.

82.     None of the documents that the Banquet Servers have requested the Union obtain from the Hotel have been obtained.

83.     The Union and the Hotel have conspired to employ other areas of the Hotel for Banquet events without paying Banquet rates set in the CBA and without using Banquet Servers as part of the on-going conspiracy to undermine the Settlement Agreement and evade the Arbitration Award.

84.     The Union purposefully is stone walling and aiding the Hotel in undermining the Banquet Servers income and the material benefits of the Settlement Agreement.

**Hotel Diverts Plaintiffs' Income to Adour Restaurant and Other Hotel Outlets**

85.     At the April 28, 2011 meeting, before management joined the meeting, Plaintiff Bejjani advised Cedeno of a dinner/dance having been booked in Adour for the following day,

and that the banquet housemen were setting up the function.

86.    In the same conversation, Plaintiff Bejjani also advised Cedeno that a large cocktail reception had taken place in Adour the prior evening.

87.    At no time did Cedeno tell Plaintiff Bejjani that Adour had a special agreement with the Union.

88.    The meeting of February 29, 2012, was attended by three banquet servers in addition to the two delegates.  Delegate Bejjani had asked these servers to attend the meeting to assist in explaining their grievance regarding a specific function. Plaintiff Kahtane was one of the servers who attended this meeting.

89.    At that meeting, Kahtane asked Cedeno regarding the situation in Adour, and Cedeno effectively gave the same answer he had given Bejjani on April 28, 2011.

90.    At no time did Cedeno make any mention of the Adour Agreement.

91.    On many occasions, the Adour issue was brought to management's attention, and at none of these occasions did management make mention of the Adour agreement.

92.    Following information that a recent meeting function had taken place in Adour, Bejjani asked for an impromptu meeting with Najemian on May 14, 2012.  O'Connor was present at the meeting.

93.    At that meeting, Najemian confirmed that a meeting function of 50-60 guests had indeed taken place in Adour a few days earlier, and that the meeting was followed by a cocktail reception for the same event.

94.    Najemian stated that he told Merjian this was not right, that he was very upset about it, that it goes over the line of decency, that boundaries had been overstepped, and that Merjian took steps to make sure this never happens again.  Najemian promised this will never

16

happen again.

95.     At that meeting, it was brought to Najemian's attention that a lot of functions that used to be booked on banquet floors are now being booked in Adour, but Najemian stated that this was not true. Thus, the Hotel continued to mislead the plaintiffs concerning the Adour issue.

96.     Plaintiff Bejjani advised Najemian that he would be seeing higher executives in the Hotel to put the Hotel on notice, and that he will be taking further steps.

97.     Moments after this meeting, Merjian told Plaintiff O'Connor not to bother seeing executives at the Hotel as they were all aware of this, adding that the Hotel intended to direct as much business as they could into the restaurant.

98.     Neither Najemian nor Merjian made any mention that there was an agreement with the Union regarding Adour.

99.     On June 13, 2012, the day when Plaintiff O'Connor came across Cedeno at the Hotel, Plaintiff O'Connor asked Cedeno about the situation with Adour.  Cedeno responded to the effect that Adour can do anything it wants because it is an independent contractor.

100.    The CBA does not grant concessionaires/independent contractors any special treatment.

101.    At the August 1, 2012 meeting, Cedeno bluntly spelled out that Adour had a special agreement with the Union, and that it can do whatever it wants.  Cedeno divulged that the agreement was made since Adour was opened.

102.    When asked why the Union did not disclose this agreement in 2008 [the year the Settlement Agreement was signed], Cedeno responded that it was never questioned.

103.    Via a letter dated August 4, 2012, Bejjani asked for a copy of the agreement, and on August 8, 2012, Bejjani received the copy.

104.   At the August 9, 2012 meeting with the Union and Management, the Hotel asked Cedeno questions concerning Adour, and Cedeno reversed his previous position regarding Adour, stating that Adour is separate because there is an agreement that was done for it.  This statement was made to lift the restrictions normally imposed on 'A La Carte' restaurants vis-a-vis Banquets.

105.   At the August 9, 2012 meeting, Merjian stated that the Hotel had been using all of its outlets for banquet functions.  Plaintiffs O'Connor and Bejjani were shocked at this revelation.  O'Connor objected.  The Union acquiesced to the practice, thereby extending the implementation of the conspiracy to undermine the CBA and Settlement Agreement.

106.   The Adour Agreement was entered into and then actively implemented by the Hotel and the Union for the purpose of depriving the Banquet Servers of the benefits of the Arbitration Award, and Settlement Agreement that implemented the Arbitration Award, in direct response to, and principally in retaliation for, the prior action.

107.   The Union and the Hotel conspired with each other to deprive the Banquet Servers of the economic benefit of the Settlement Agreement and thereby the Union breached its duty of fair representation and the Hotel breached the material terms of the Settlement Agreement.

## CAUSE OF ACTION I

108.   Plaintiff realleges each of the allegations contained in paragraphs "1" through "107" of the complaint as if fully set forth herein.

109.   The Union by intentionally concealing the existence of the Adour Agreement and by otherwise aiding and abetting the Hotel's efforts to undermine the economic benefits of the Settlement Agreement received by the Banquet Servers breached its duty of fair representation to

the Banquet Servers.

110.   By reason thereof, plaintiffs have been economically injured in an amount to be determined at trial.

## CAUSE OF ACTION II

111.   Plaintiff realleges each of the allegations contained in paragraphs "1" through "107," and "109"of the complaint as if fully set forth herein

112.   The Hotel materially breached the terms of the Settlement Agreement as well as the CBA by conspiring with the Union to intentionally undermine the economic benefits of the Agreement to the plaintiffs.

113.   By reason thereof, plaintiffs have been economically injured in an amount to be determined at trial.

## CAUSE OF ACTION III

114.   Plaintiff realleges each of the allegations contained in paragraphs "1" through "107," "109," and "112"of the complaint as if fully set forth herein

115.   The Hotel breached the duty of good faith and fair dealing underlying the Settlement Agreement by acting in a manner designed to deprive plaintiffs of the economic benefits of the Settlement Agreement.

116.   For all of the foregoing reasons, plaintiffs have been economically injured in an amount to be determined at trial.

## PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY

**WHEREFORE**, plaintiffs respectfully request the following relief:

On the First Cause of Action compensatory relief in an amount to be determined at trial and punitive damages;

On the Second Cause of Action, compensatory relief in an amount to be determined at

trial;

On the Third Cause of Action, compensatory relief in an amount to be determined at trial,

An injunction enjoining defendants from further undermining the Settlement Agreement

by diverting banquet events away from the Hotel's Banquet Department;

An Order directing that Banquet Servers work all Banquet events in the Hotel no matter

where located in the Hotel;

Reasonable Attorneys Fees; and

For such further relief as the Court deems just and proper.

Dated: New York, New York
      August 29, 2012

                       KAISER SAURBORN & MAIR, P.C.
                         Attorneys for plaintiffs

By:           _____
                     Daniel J. Kaiser [DK-9387]
                     111 Broadway, Suite 1805
                     New York, New York 10006
                     (212) 338-9100