UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                          :
JOSEPH BEJJANI, et al.,                                   :
                                    Plaintiffs,           :
                                                          :          12 Civ. 6618 (JPO)
                     -against-                            :
                                                          :          MEMORANDUM AND
MANHATTAN SHERATON CORPORATION                            :                ORDER
d/b/a ST. REGIS HOTEL, et al,                             :
                                    Defendants.           :
                                                          :
---------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

        This case arises from a labor dispute at the St. Regis Hotel.  Plaintiffs allege that their

union violated its duty of fair representation and that their employer violated the terms of the

collective bargaining agreement.  Defendants have moved to dismiss pursuant to Rule 12(b)(6).

For the reasons that follow, Defendants' motions are granted and this case is dismissed.

I.      **Background**[1]

        Plaintiffs are banquet servers employed by Defendant Manhattan Sheraton Corporation

("the Hotel") and represented by Defendant New York Hotel & Motel Trades Council, AFL-CIO

("the Union").  The Hotel and the Union (collectively, "Defendants") are parties to a multi-

employer collective bargaining agreement negotiated by and between the Union and a hotel trade

association; this agreement is commonly referred to as the Industry-Wide Agreement ("the

IWA").  Plaintiffs are employed by the Hotel under the terms and conditions of the IWA.

        On November 30, 2007, some of the plaintiffs in this case filed a civil complaint in this

Court alleging a breach of the duty of fair representation ("DFR") by the Union and breach of the

---

[1] These facts are taken from the Complaint and assumed to be true for purposes of this opinion.
*See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006).

then-operative CBA by the Hotel ("the 2007 Action").[2]  In the 2007 Action, the plaintiffs

alleged, *inter alia*, that the Union and the Hotel had failed to abide by an arbitration decision

requiring the payment to the plaintiffs of gratuities on the revenue generated from room rental

and other fees associated with banquet events ("the Arbitration Award").  The plaintiffs also

alleged the existence of an illegal "tip pool" that deprived them of millions of dollars of gratuity

compensation.

During the pendency of the 2007 Action, the Union and the Hotel entered into several

agreements regarding certain then-pending grievances brought by or on behalf of the Hotel's

banquet servers.  Those agreements were ultimately encompassed by an Omnibus Agreement,

dated September 8, 2008, that, in part, made dismissal of the 2007 Action a condition precedent

for the Hotel's obligations under those several obligations settled in 2008.  Pursuant to Exhibit E

of the Omnibus Agreement, the Hotel agreed to pay $47,000 per banquet server "in full and

complete satisfaction of any and all matters arising out of all outstanding banquet issues."  Each

plaintiff in the 2007 Action also executed a "Release of Claims," that released the Hotel and the

Union of "any and all claims, including, but not limited to, complaints, suits, charges,

obligations, promises, agreements . . . of any nature whatsoever, in law or in equity, which

Releasors now have or may have against the Hotel-Releasees or the Union-Releasees from the

beginning of time to the date of this Agreement."  The Release encompassed "all claims" that

each plaintiff "asserted" or "could have . . . asserted."  Each Releasor affirmed that he or she was

"not relying on any promises, assurances, or commitments made to me by the Hotel or the

Union, or their agents or representatives, other than as is expressly stated in the Grievance

Adjustment Agreements."  Plaintiffs all executed such a release between September 17 and

---

[2] Joseph Bejjani et al. v. Manhattan Sheraton Corp. d/b/a St. Regis Hotel and New York & Motel
Trades Council, ALF-CIO, No. 07 Civ. 10729 (HB).

September 23, 2008.  The Omnibus Agreement also incorporated an arbitration clause providing that "[a]ny disputes regarding the interpretation or application of this Agreement shall be submitted to final and binding arbitration in accordance with the grievance and arbitration provisions of the IWA."  On October 2, 2008, Judge Baer entered a consent order in the 2007 Action terminating the case and dismissing all claims.

Plaintiffs allege that the Omnibus Agreement was part of an overarching conspiracy by the Union and the Hotel to violate Plaintiffs' rights.  These allegations hinge largely on the so-called "Adour Agreement."  On January 11, 2008, before Plaintiffs entered into the Omnibus Agreement, the Union and the Hotel entered into an agreement related to Adour, a restaurant in the Hotel.  In pertinent part, this Agreement provided that "[b]anquet or private functions scheduled through Adour and taking place in the space occupied by Adour at any time of the day and without regard to whether the Restaurant is open or closed to the general public shall be assigned to and serviced by the Adour staff at the time of the banquet or function."

Plaintiffs allege that the Adour Agreement extended the IWA "to effectively give the Hotel full banquet rights at its 'A La Carte' restaurant, while exempting it from banquet pay rates and other terms and conditions of employment for banquet personnel."  Noting that the server pay rates authorized by the Adour Agreement are "much reduced" from those of banquets under the IWA, Plaintiffs allege that the Adour Agreement created "a de facto competitive second banquet department within the Hotel which effectively makes the plaintiffs secondary banquet servers."  In sum, Plaintiffs allege that "[t]he purpose of the Adour Agreement is to undermine the Banquet Servers['] entitlement to gratuities and wages at the rate required by the IWA and the arbitration award by shifting banquet events to the restaurant[,] where the service pay rates are much lower by consent of the Union [and] not subject to the wages and gratuity rates set forth in the IWA and the [Omnibus Agreement]."

Plaintiffs did not become aware of the Adour Agreement until August 1, 2012, well after the Omnibus Agreement. They allege that their lack of knowledge resulted from intentional acts of concealment by Defendants. Plaintiffs' attorney was present at the negotiations that produced the Omnibus Agreement, but neither he nor his clients learned of the Adour Agreement. Plaintiffs do not allege that the Union made any affirmative representations to them during the Omnibus Agreement negotiations concerning the allocation of work for banquet events at Adour.

Plaintiffs allege that, in furtherance of their conspiracy and with knowledge of the Adour Agreement, Defendants caused the following language to be included in the Omnibus Agreement: "The Union acknowledges that there are no other banquet grievances of which it has knowledge, or of which it should have knowledge, as of the date of the Omnibus Agreement." The Omnibus Agreement also provided that "[n]othing in this Omnibus Agreement . . . shall be interpreted to authorize the Hotel to reduce any benefits currently received by tipped banquet employees, except as set forth in the Omnibus Agreement or the attached Settlement Agreements." The Settlement Agreement, in turn, provided that "except as modified by the Banquet Settlements and this Omnibus Agreement, . . . the work and pay practices of the Hotel's Banquet Department are consistent with the [IWA], decisions of the Office of the Impartial Chairman, and applicable law." Plaintiffs allege that, notwithstanding these provisions, the purposefully concealed Adour Agreement misled Plaintiffs as to what they were agreeing to settle in the Omnibus Agreement and materially impacted upon the value of that settlement. Plaintiffs allege "upon information and belief" that Defendants, "at the time the [Omnibus Agreement] was executed[,] agreed that they would cooperate to intentionally undermine the agreement by taking actions to minimize the benefits that were provided to the Banquet Servers by the [Omnibus] Agreement." Plaintiffs further allege that "[t]he Adour Agreement, in

particular, and its implementation materially diminishes the benefits of the [Omnibus]

Agreement and undermines its purpose and intent."

If Plaintiffs had been aware of the Adour Agreement prior to executing the Omnibus

Agreement, they would not have agreed to the terms of the Omnibus Agreement in the form in

which it was executed.  Plaintiffs add that "[t]he Adour Agreement was entered into and then

actively implemented by the Hotel and the Union for the purpose of depriving the Banquet

Servers of the benefits of the Arbitration Award, and [Omnibus] Agreement that implemented

the Arbitration Award, in direct response to, and principally in retaliation for, [the 2007

Action]."

Plaintiffs allege that, after the Omnibus Agreement was concluded, Defendants, "working

in concert, began to create and/or enhance practices unknown to plaintiffs, and to execute a plan

to make the practices permanent in order to effectively erode plaintiffs' income and the benefits

to which the Arbitration Award [at issue in the 2007 Action] and [Omnibus] Agreement entitled

them."  For instance, the Hotel "increasingly began to divert banquet events normally serviced

by the banquet servers to Hotel rooms by removing beds and 'converting' the rooms into banquet

rooms," impliedly because "[t]he Hotel staff, Room Service servers, that services the Hotel

rooms are compensated at a much lower rate."  Each time Plaintiffs questioned the legal

appropriateness of this practice, the Union allegedly conceded that it violated the IWA.  As part

of its conspiracy to undermine the Omnibus Agreement, the Union did not take any meaningful

steps to address these violations.  The Union also misrepresented to Plaintiffs that it had

undertaken to obtain information about this practice from the Hotel; in fact, the Union never

requested such information from the Hotel.

During a meeting held on February 29, 2012, Plaintiff Bejjani, a Union delegate, called

attention to a two-day banquet meeting that had been held at the Hotel on December 5 and 6,

2011.  Although the Union "conceded this practice violated the CBA," it "refused to arbitrate the issue."  Plaintiffs allege that "[t]he Hotel had declined to pay contractual compensation to banquet servers . . . on the grounds that it cannot charge the client twice, and that the client was already charged on the Hotel floors."  At this meeting, Mr. Cedeno, a Union vice president and business agent, referenced a recent favorable arbitration decision that allegedly "sides with banquets against room service regarding service of banquet functions on the guest floors."  Cedeno instructed the Hotel to arrange a meeting with the room service servers regarding the new arbitration decision, adding that the Hotel should employ banquet servers on hotel floors if the room servers could not reach a solution with the banquet servers.  Plaintiffs allege that this instruction was a "sham" and "intentional cover for a practice that the Hotel and the Union had conspired to continue for the express purpose of undermining the [Omnibus] Agreement."  At the end of this meeting, a follow-up meeting was scheduled for March 12, 2012, and Bejjani asked Cedeno for a copy this new arbitration.  Cedeno sent the decision that afternoon.

The arbitration decision in question, dated April 19, 2011 and brought in regard to the London Hotel NYC, described the disputed practice in the following terms:

> When the duplex, Rooms 506 and 508, and Sky were booked as meeting rooms or for banquet functions, the Hotel assigned the work to Banquets, but when these same rooms were booked as guest rooms in conjunction with a guest's function in that room or other rooms, the work was assigned to Room Service.  The Hotel based its assignment on whether, on booking the room, the guest expressed an interest to sleep or stay in the room.  In certain cases, when the guest's intention changed, the Hotel had, on occasion, changed the assignment accordingly.

The arbitrator, from the Office of the Impartial Chairperson, found and awarded that "the current practice of assigning the work in question should continue."

Plaintiffs also describe the diversion of their income to Adour and other Hotel outlets.  At an April 28, 2011 meeting, before management arrived, Plaintiff Bejjani advised Cedeno of a

dinner/dance having been booked in Adour for the following day.  Bejjani added that the banquet

housemen were setting up the function and that a large cocktail reception had taken place in

Adour the prior evening.  At that time, Cedeno did not inform Bejjani of the Adour Agreement.

Then, at the February 29, 2012 meeting, Plaintiff Kahtane asked Cedeno about the situation in

Adour.  Again, Cedeno did not mention the Adour Agreement.  Plaintiffs allege that the Adour

issue was brought to management's attention on many occasion, but "at none of these occasions

did management make mention of the Adour [A]greement."  On May 14, 2012, Bejjani, joined

by O'Connor, held an impromptu meeting with the Director of Banquet Services, Mr.

Najemian.[3]  Najemian confirmed that a meeting of 50-60 guests had taken place in Adour a few

days earlier, followed by a cocktail reception for the same event.  Najemian added that he had

told the Director of Banquets, Merjian, that this was not right, and promised that it would never

happen again.  Najemian denied that many functions that used to be booked on the banquet floor

are now booked in Adour.  Moments after this meeting, Merjian told O'Connor not to bother

seeing executives at the Hotel as they were all aware of this trend and intended to direct as much

business as they could into Adour.  Merjian did not mention the Adour Agreement.  On June 13,

2012, O'Connor asked Cedeno about the Adour situation.  Cedeno responded that Adour can do

as it pleases because it is an independent contractor.  The CBA does not grant

concessionaires/independent contractors any special treatment.

Meanwhile, on March 9, 2012, Najemian had notified Bejjani that the meeting scheduled

for March 12, 2012 had been rescheduled to March 21, 2012.  On March 13, 2012, the Union

cancelled the March 21, 2012 meeting, on the ground that Cedeno was being dispatched by the

Union to Washington, D.C. on official Union business and it was unknown when Cedeno would

return.  Plaintiff alleges that "as echoes resounded at the Hotel that Cedeno had been back,

---

[3] O'Connor was originally a plaintiff here, but voluntarily dismissed his claims on May 14, 2013.

delegate Morcos placed a few calls to Cedeno's cell phone[, but] [n]one of the calls were returned."  On June 13, 2013, O'Connor encountered Cedeno at the Hotel, at which point Cedeno stated that Bejjani had misinterpreted the London Hotel NYC Decision.

On July 10, 2012, Plaintiffs' counsel wrote to the Union's General Counsel, Mr. Maroko, to express concern about the conversion of bedroom floors into banquet facilities, warn of a potential CBA violation, and urge the Union to oppose—rather than acquiesce in—the Hotel's violations.  On July 13, 2012, a representative of the Union, Clarke, called Bejjani and a follow-up meeting was scheduled for August 1, 2012.  Clarke stated that a Hotel manager had not been available before that date.  On July 18, 2012, another representative of the Union, Tremonti, replied to the letter sent by Plaintiffs' counsel on July 10, 2012.  In pertinent part, this reply stated as follows:  "The Union is currently looking into this matter further and has sent requests for information to the Hotel.  If your clients have any further questions or concerns, they can contact their business agent, Eddie Cedeno, or myself . . . ."  Plaintiffs allege that the Union nonetheless took no substantive action to investigate, since "it knew full well what was happening and supported the actions."  On July 30, 2012, Bejjani sent a letter to Peter Ward, President of the Union, accusing the Union of "17 years of duplicity which culminated in our 2008 agreement" and insisting that "you are personally behind the events and the dramas aimed at our defeat at the Hotel because of the debt you owe the Hotel."

On August 1, 2012, Cedeno spelled out that Adour had a special agreement with the Union and divulged that the Agreement had existed since Adour opened.  When asked why the Union had not disclosed this agreement in 2008, the year the Omnibus Agreement was signed, Cedeno responded that it was never questioned.  At an August 9, 2012 meeting with the Union and Management, the Hotel asked Cedeno about Adour.  Cedeno reversed his prior position regarding Adour, stating that Adour is separate because there is an agreement that was done for

8

it.  Plaintiffs allege that "[t]his statement was made to lift the restrictions normally imposed on 'A La Carte' restaurants vis-à-vis Banquets."  At this meeting, Merjian stated that the Hotel had been using all of its outlets for banquet functions.  O'Connor objected, but the Union acquiesced to the practice.  Plaintiffs allege that the Union "thereby extend[ed] the implementation of the conspiracy to undermine the CBA and [Omnibus] Agreement."

The Union allegedly remains steadfast in its refusal to file an arbitration demand concerning the practice of using Hotel rooms for Banquet events and "generally the Hotel's practice of the diversion of banquet server income."  It also refuses to meet and confer with the Banquet Servers in good faith to discuss the issue.  Upon information and belief, Plaintiffs allege that the Union "wants this practice to continue and intensify so that its goal of undermining the benefits of the [Omnibus] Agreement is realized."

## II.    Standard of Review

To survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw [ ] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotations omitted).  That said, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  In a summary of the plausibility standard, the Second Circuit explained that:

> [*Twombly*] stated that a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, but mere labels and conclusions or formulaic recitations of the elements of a cause of action will not do; rather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible.

*Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (quotation marks and internal citations omitted).  The Circuit clarified that this rule "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegality." *Id.*  (citing *Twombly*, 550 U.S. at 556) (quotation marks omitted).

## III.   Discussion

### A.   Legal Standard

#### 1.   Duty of Fair Representation

"The 'duty of fair representation is implied from § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a),'" *Mandavia v. Columbia Univ.*, No. 12 Civ. 2188, 2012 WL 6186828, at *14 (S.D.N.Y. Dec. 12, 2012) (quoting *White v. White Rose Food*, 237 F.3d 174, 179 n.3 (2d Cir. 2001)), and "marks the outer boundary of a union's broad discretion to represent members of a bargaining unit," *Acosta v. Potter*, 410 F. Supp. 2d 298, 308 (S.D.N.Y. 2006).  Simply put, a union "has a duty to represent fairly all employees subject to the collective bargaining agreement." *Spellacy v. Airline Pilots Ass'n–Int'l*, 156 F.3d 120, 126 (2d Cir. 1998) (citing *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 74 (1991)).  Because the NLRA allows "a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the unit of the ability to bargain individually or to select a minority

union as their representative," it is the duty of the exclusive bargaining agent invested with this

authority "to serve the interests of all members without hostility or discrimination toward any, to

exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."

*DelCostello v. Int'l Bhd. Of Teamsters*, 462 U.S. 151, 164 n.14 (1983); *see also Agosto v. Corr.*

*Officers Benev. Ass'n*, 107 F. Supp. 2d 294, 303 (S.D.N.Y. 2000) (noting that the DFR "derives

from the union's statutory role as exclusive bargaining agent" (quotation marks omitted)).

"A breach of the statutory duty of fair representation occurs . . . when a union's conduct

toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."

*Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *see Marquez v. Screen Actors Guild*, 525 U.S. 33, 44

(1998).  Judicial review of such allegations is "highly deferential, recognizing the wide latitude

that [unions] need for the effective performance of their bargaining responsibilities." *O'Neill*,

499 U.S. at 78.  "To prove that a union has breached its duty of fair representation, the

challenging members must establish two elements.  *First,* they must prove that the union's

actions or inactions are either arbitrary, discriminatory, or in bad faith.  *Second,* the challenging

members must demonstrate a causal connection between the union's wrongful conduct and their

injuries." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709-10 (2d Cir. 2010) (quotation

marks and citations omitted) (emphasis in original).  As Judge Pooler has explained:

> A union's actions are "arbitrary only if, in light of the factual and
> legal landscape at the time of the union's actions, the union's
> behavior is so far outside a wide range of reasonableness as to be
> irrational." *O'Neill,* 499 U.S. at 67 (citation and quotation marks
> omitted).  Moreover, "[t]actical errors are insufficient to show a
> breach of the duty of fair representation; even negligence on the
> union's part does not give rise to a breach." *Barr v. United Parcel
> Serv., Inc.*, 868 F.2d 36, 43 (2d Cir. 1989).  A union's acts are
> discriminatory when "substantial evidence" indicates that it
> engaged in discrimination that was "intentional, severe, and
> unrelated to legitimate union objectives." *Amalgamated Ass'n of
> St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403
> U.S. 274, 301 (1971).  Bad faith, which "encompasses fraud,

> dishonesty, and other intentionally misleading conduct," requires
> proof that the union acted with "an improper intent, purpose, or
> motive." *Spellacy*, 156 F.3d at 126 (citations omitted).

*Vaughn*, 604 F.3d at 709-10; *see also, e.g.*, *Acosta v. Potter*, 410 F. Supp. 2d at 311 ("The

Supreme Court's test for arbitrariness—which requires that a union behave irrationally—is

difficult to meet.").   In applying this law, courts "are not necessarily left with shifting ad hoc

standards to be fashioned anew in each case, [though they do] have broad parameters of

judgment that necessarily vary from context to context."  *Ryan v. N.Y. Newspaper Printing

Pressmen's Union No. 2*, 590 F.2d 451, 455 (2d Cir. 1979).

One of the more familiar rules of DFR jurisprudence is that "a union member does not

have an absolute right to have a grievance taken to arbitration."  *Biberaj v. Pritchard Indus., Inc.*,

859 F. Supp. 2d 549, 561 (S.D.N.Y. 2012) (citing *Carrion v. Local 32B–32J SEIU*, No. 03 Civ.

1896, 2005 WL 659321, at *6 (S.D.N.Y. March 21, 2005)); *see also Tomney v. Int'l Ctr. for

Disabled*, 357 F. Supp. 2d 721, 735 (S.D.N.Y. 2005).

It is also well settled that a union enjoys "broad discretion to adjust the demands of

competing groups within its constituency as long as it does not act arbitrarily."  *Jones v. Trans

World Airlines, Inc.*, 495 F.2d 790, 798 (2d Cir. 1974).  Thus, though an "employee may

challenge actions other than those involving anti-minority animus or malice," union actions that

reveal good faith trade-offs among employee constituencies do not give rise to DFR claims.

*Ryan v. New York Newspaper Printing Pressmen's Union No. 2*, 590 F.2d 451, 455 (2d Cir.

1979).  Indeed, the Second Circuit has emphasized that "[a] union's reasoned decision to support

the interests of one group of employees over the competing interests of another group does not

constitute arbitrary conduct."  *Spellacy*, 156 F.3d 120, 129 (2d Cir. 1998) (citations omitted); *see

also Vaughn*, 604 F.3d at 712 ("[T]here is no requirement that unions treat their members

identically as long as their actions are related to legitimate union objectives." (citation omitted)).

## 2.    Hybrid Claims: DFR and Breach of the CBA

"Although formally compris[ing] two separate causes of action, a suit in which an employee alleges that an employer has breached a CBA and that a union has breached its duty of fair representation by failing to enforce the CBA is known as a 'hybrid § 301/fair representation claim.'" *Acosta*, 410 F. Supp. 2d at 308 (quoting *DelCostello*, 462 U.S. at 164-65); *see also McKee v. Transco Products, Inc.*, 874 F.2d 83, 86 (2d Cir. 1989) ("[R]egardless of who is named as a defendant, a hybrid claim is presented if an employee has a cause of action against both the employer and the union, where the two claims are inextricably linked, and where the case to be proved is the same against both.").  "The suit combines Section 301 of the Labor Management Relations Act, 29 U.S.C. § 1985, which governs suits for violation of contracts between an employer and a labor organization, with § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), which grants unions exclusive representational status over members of the relevant bargaining unit and from which courts have implied a union's duty to fairly represent its members." *Pilchman v. Am. Fed'n of State, Cnty. & Mun. Employees, AFL-CIO*, No. 10 Civ. 4976, 2011 WL 4526455, at *5 n.9 (S.D.N.Y. Sept. 29, 2011).  These suits are referred to as hybrid "because, when a CBA contains a binding grievance and arbitration process, an employee cannot avoid the private dispute resolution mechanism simply by suing her employer in court." *Acosta*, 410 F. Supp. 2d at 308 (citation omitted).  "The 'judicial forum will still be open' only if the employee can show that either failure to pursue the grievance process or the unsuccessful result thereof was 'due to the Union's wrongful conduct, that is, a breach of its duty to represent plaintiff fairly.'"  *Id.* (quoting *Young v. U.S. Postal Serv.*, 907 F.2d 305, 307 (2d Cir. 1990)); *see also Vaca*, 386 U.S. at 186 ("[A] wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies,

provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance.").

"To establish a hybrid § 301/DFR claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members."  *White*, 237 F.3d at 178.  "Because a union's breach of the duty of fair representation 'is a prerequisite to consideration of the merits of plaintiff's claim against' an employer for breach of a CBA, courts presented with hybrid claims need not reach the question of whether the employer violated the CBA unless the union has acted arbitrarily, in bad faith, or discriminatorily."  *Acosta*, 410 F. Supp. 2d at 309 (citing *Young*, 907 F.2d at 307).  Accordingly, if Plaintiffs have failed to state a DFR claim, then their claim against the Hotel for breaching the terms of the CBA also must be dismissed.

**B.      Duty of Fair Representation: Application of Law to Facts**

"A breach of the statutory duty of fair representation occurs . . . when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190.  Plaintiffs argue that the Union breached the DFR by entering into the Adour Agreement, failing to grieve or adequately address the transfer of certain banquet-style events to hotel rooms, and, more generally, conspiring with the Hotel throughout this course of events to deprive Plaintiffs of the benefits afforded to them in the Omnibus Agreement.

**1.      The Adour Agreement**

Plaintiffs allege that the Union's participation in the creation and implementation of the Adour Agreement violated the DFR.  Specifically, Plaintiffs suggest that the Adour Agreement is arbitrary and an exercise of bad faith.  This claim does not succeed.

When confronted by claims that a union acted arbitrarily, courts start with the recognition that unions enjoy a broad sphere of discretion and will be held to violate the DFR only where

their actions fall "so far outside a wide range of reasonableness as to be irrational."  *O'Neill*, 499 U.S. at 67 (quotation marks and citations omitted).  There can be no question that the Union was within its rights to negotiate the Adour Agreement, as no provision of the IWA prevented any such negotiations or spoke to the question of how the Union should address entities like Adour.  Rather, the creation of such deals is an ordinary part of union business.  *See O'Neill*, 499 U.S. at 74 (noting that "[t]he Government has generally . . . relied on private negotiation between the parties to establish their own charter for the ordering of industrial relations." (quotation marks and citations omitted)).  Nor do the Adour Agreement's redistributive effects among Union employees based at the Hotel, including its harmful effects on Plaintiffs, constitute an irrational act by the Union.  *See Spellacy*, 156 F.3d at 129; *Ryan*, 590 F.2d at 455-56.  To the contrary, it would have been entirely rational for the Union to favor an agreement allowing Adour servers to handle functions held at Adour.  *See Vaughn*, 604 F.3d at 712 ("[T]here is no requirement that unions treat their members identically as long as their actions are related to legitimate union objectives." (citation omitted)).

Plaintiffs further allege that the Union acted in bad faith by "concealing" the Adour Agreement, but this argument misunderstands the nature of the Union's obligations.  In *Lewis v. Whelan*, the Second Circuit held that active concealment by a union official of a union-employer agreement secretly abrogating a term of the CBA constitutes "bad faith" for purposes of a DFR claims.  25 F.3d 1138, 1142-43 (2d Cir. 1994).  In *Lewis*, the union president concealed from employees a secret oral arrangement sacrificing contractually specified seniority rights, even as he assured employees that they would receive benefits he had privately traded away.  *See id.*  Plaintiffs read *Lewis* as creating a general bar on agreements not approved by or presented to union members.  It cannot bear that weight.  The Second Circuit has since clarified that any such claim must involve an "unambiguous contractual entitlement," *Spellacy*, 156 F.3d at 129, and

15

explained that, absent contrary terms in a union's bylaws or constitution, "[f]ederal labor law does not require rank-and-file ratification of employer-union agreements," *White*, 237 F.3d at 182. Further, as Judge Mukasey noted in *Acosta v. Potter*, a concealment-based DFR claim ordinarily requires evidence that a union "misled employees" or acted with "improper motive." 410 F. Supp. 2d at 312; *see also Cunningham v. Local 30, Int'l Union of Operating Engineers*, 234 F. Supp. 2d 383, 399 n.3 (S.D.N.Y. 2002) ("Courts have found a breach of the federal duty of fair representation when a union leader has *purposefully concealed* or *misrepresented* matters in his dealings with members." (citations omitted) (emphasis added)).

Here, Plaintiffs' claim fails for two reasons: lack of an unambiguous contractual obligation and failure to allege plausibly that they were misled by Union officials.

First, Plaintiffs cannot plausibly allege that they enjoyed a clear contractual right under the IWA that the Union violated by negotiating the Adour Agreement. To be sure, the Second Circuit has recognized that an arbitration award does confer a contractual right, the violation of which can support a hybrid DFR claim. *See Carrion*, 227 F.3d at 33-34 ("An employee who alleges that his union failed to enforce an arbitration award alleges thereby that the union violated its duty of fair representation."). And at least one district court has applied similar logic in the context of a settlement agreement. *See Stephens v. Bayview Nursing & Rehab. Ctr.*, No. 07 Civ. 0596, 2008 WL 728896, at *4 (E.D.N.Y. Mar. 17, 2008). Yet even if the Court were to accept that the Omnibus Agreement created a contract right that the Adour Agreement could have violated—a dubious assumption given that the Omnibus Agreement was signed eight months *after* the Adour Agreement—the question whether the Adour Agreement violated any of Plaintiffs' unambiguous rights would still pose an insurmountable obstacle to Plaintiffs' claim.

After all, in the section relied upon by Plaintiffs, the Omnibus Agreement provides only that "[n]othing in this Omnibus Agreement . . . shall be interpreted to authorize the Hotel to

16

reduce any benefits currently received by tipped banquet employees, except as may be set forth in the Omnibus Agreement or the attached Settlement Agreement."  Given both common sense and the fact that this agreement was designed to resolve certain then-pending grievances, this clause does not mean that banquet servers enjoy *absolute* protection from *any* future change in status, regardless of the cause (*e.g.*, it would not violate this clause to provide them with less work even if half the hotel fell into the earth).  Rather, its reference to "benefits" clearly means— or, as suffices for purposes of a DFR claim, *could reasonably be interpreted to mean, see Spellacy*, 156 F.3d at 129—benefits of the sort that had prompted the grievances being settled. "Benefits" did not refer to the circumstances under which they were entitled to service a banquet. For that reason, the Adour Agreement, which dealt with the separate issue of which staff would cover functions hosted in Adour, did not breach any contractual right possessed by the banquet servers.  At the very least, it would have been reasonable for the Union to interpret the Omnibus Agreement as being entirely silent with respect to the sorts of issues implicated by the Adour negotiations.  Because the Adour Agreement did not secretly destroy or abrogate any "unambiguous contractual entitlement," *Spellacy*, 156 F.3d at 129, it cannot serve as the basis of a bad faith-based DFR claim by mere virtue of its non-public nature.

Second, any such claim must fail on the independent ground that Plaintiffs have failed to allege plausibly the prerequisite misdirection by Union officials.  This is not a case where the Union was required by its bylaws, the IWA, or its constitution to disclose the Adour Agreement or seek member approval before entering into such an arrangement.  *Cf. White*, 237 F.3d 180. Accordingly, Plaintiffs must show acts of misdirection or improper motive.  *Acosta*, 410 F. Supp. 2d at 312.  Plaintiffs do allege improper motive to conceal—a conspiracy to retaliate after the Omnibus Agreement—and the Court addresses those allegations *infra* in section III.B.2.c.

As to misdirection, Plaintiffs' allegations fall short of the high threshold required to prove bad faith.  Unlike the plaintiffs in *Lewis*, Plaintiffs do not allege affirmative misrepresentations or outright lies by the Union.  To the contrary, they allege that Cedeno "never questioned" the need to tell them about the Adour Agreement.  This judgment may have been imperfect, but it was hardly unreasonable in light of the major differences between the Omnibus and Adour Agreements—one of which remedied outstanding grievances arising from an illegal tip pool, the other of which, on its face, only incidentally implicated the banquet servers.  Plaintiffs also allege that Cedeno called Adour an "independent contractor" and suggested that it merited special attention.  While this statement may not have been correct, that fact could easily have become known to Plaintiffs had they consulted the CBA (which does not grant independent contractors special treatment).  In any event, this single statement alone does not demonstrate the sort of bad faith prerequisite to a DFR claim.  In the end, individually and collectively, Plaintiffs' allegations "support[] a claim of negligence, not bad faith."  *Vaughn*, 604 F.3d at 710.

### 2. Functions in Hotel Rooms

Plaintiffs allege that the Union breached the DFR by failing to file grievances and seek arbitration with respect to the Hotel's transfer of banquet functions to hotel rooms.  Analysis of this claim rests upon the familiar rule that "[a] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational."  *White*, 237 F.3d at 179 (quotation and citation marks omitted).  That rule, in turn, dictates rejection of Plaintiffs' arguments.

In sum, Plaintiffs allege that the Union did not act quickly enough in response to their calls for arbitration.  Of course, "a union member does not have an absolute right to have a grievance taken to arbitration," *Biberaj*, 859 F. Supp. 2d at 561 (citing *Carrion*, 2005 WL 659321, at *6), and unions generally enjoy broad discretion in determining when, how, and with

which arguments to advance a grievance, *see Tomney*, 357 F. Supp. 2d at 737.  Although the

Second Circuit "has recognized that a union may breach its duty when it fails to process a

meritorious grievance in a timely fashion with the consequence that arbitration on the merits is

precluded," *Young v. United States Postal Service*, 907 F.2d 305, 308 (2d Cir. 1990) (citing

cases), courts typically require evidence of prejudice, non-compliance with time limits set forth

in a CBA, egregious departure from standard union practice, or other evidence of bad faith

before basing a DFR violation on too-slow grievance of a claim, *see, e.g.*, *Lettis v. U.S. Postal

Serv.*, 39 F. Supp. 2d 181, 199-200 (E.D.N.Y. 1998).  *See also Rahman v. Museum of Natural

History, City of New York*, No. 10 Civ. 921, 2012 WL 1077679, at *5 (E.D.N.Y. Mar. 30, 2012)

(finding no DFR violation where union waited two years).  Plaintiffs have not alleged any

facts—beyond the overarching conspiracy discussed *infra*—that even tend to suggest that the

Union's delay, including the series of cancelled meetings and missed phone calls, satisfies these

requirements.  Accordingly, before filing a grievance, the Union was entitled to deliberate for

more than the six months that Plaintiffs afforded before filing this lawsuit on August 29, 2012.

Further, Plaintiffs acknowledge that the Union was in possession of the London Hotel

NYC arbitration ruling, which upheld the London Hotel's policy of assigning guest rooms to

regular hotel staff on at least some occasions that ultimately involved banquet-like functions.

While Plaintiffs' case in the arbitration process may be stronger than and distinguishable from

the London Hotel case, the Union could reasonably have interpreted the London Hotel decision

as a reason to look warily upon its odds of success in the grievance process.  *See Spellacy*, 156

F.3d at 127 ("[O]ur inquiry is limited to whether the union took a position on the basis of an

informed, reasoned judgment regarding the merits of the pilots' claim in light of the language

contained in the collective bargaining agreement.").  That analysis, in turn, further supports the

reasonableness of waiting more than a few months to bring a claim.

19

Indeed, even if the Union *never* grieved Plaintiffs' claim, it is not clear that Plaintiffs could prove a DFR violation.  A union enjoys "broad discretion to adjust the demands of competing groups within its constituency as long as it does not act arbitrarily."  *Jones*, 495 F.2d at 798.  If the Union avoided arbitration, Room Service servers would continue to service these functions.  That the Union elected to allow other employees it represented to receive work opportunities that Plaintiffs coveted for themselves does not necessarily mean it breached any duty it owed to them, not least because it owed exactly the same duty to the Room Service servers.  Indeed, Plaintiffs have not identified language in the IWA that expressly controls their right to service those rooms in lieu of the Room Service servers.  To the extent that Plaintiffs rely exclusively on the Omnibus Agreement, their interpretation of its reference to "benefits" is tenuous for the reasons set forth *supra* with respect to the Adour Agreement.

In the end, Plaintiffs' allegations pertaining to functions in hotel rooms fall short of the standard required even at this early stage in the case and cannot survive.

### 3.   Overarching Conspiracy

This case ultimately turns on Plaintiffs' claim that Defendants' behavior was part of an elaborate conspiracy to retaliate against Plaintiffs for disagreements reflected in the Omnibus Agreement.  Plaintiffs repeatedly allege that Defendants acted in concert to undermine and destroy the benefits afforded by the Omnibus Agreement, and that Defendants took fraudulent and deceitful steps to achieve that goal.  It is beyond question that Plaintiffs could state a DFR claim if the Union's actions, even its otherwise lawful actions, were driven by "an improper intent, purpose, or motive" and thereby constituted "fraud, dishonesty, [or] intentionally misleading conduct."  *Spellacy*, 156 F.3d at 126.  The parties dispute, however, whether Plaintiffs' allegations of sustained conspiracy surmount the applicable pleading standards.

20

As the Supreme Court held in *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

*Twombly*, the case that launched the modern pleadings revolution, took as its starting point the need to substantiate accusations of conspiracy with at least a few factual brushstrokes that bespeak plausibility.  *See Twombly*, 550 U.S. at 557 ("An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'").  Indeed, the oft-overlooked facts of *Twombly* are instructive here.  The *Twombly* plaintiffs alleged an anticompetitive "agreement" among telecommunications companies.  550 U.S. 544.  Because Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "only restraints [of trade] effected by a contract, combination, or conspiracy," *id.* at 553 (citation omitted), the Supreme Court recognized that alleging such an agreement was necessary to state a claim under that section—but the Court held that asserting the existence of such agreement, without more, was not sufficient to survive a motion to dismiss, *id.* at 556-57.  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice."  *Id.* at 556.  The Court quoted reasoning from the First Circuit in an analogous case: "[t]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint."  *Id.* at 557 (quoting *DM Research, Inc. v. Coll. of Am.*

21

*Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999)); *see also id.* at 556-57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").

Since then, courts have emphasized the importance of pleading sufficient subsidiary facts when alleging the existence of a conspiracy.  *See, e.g.*, *Peoples v. Fischer*, No. 11 Civ. 2694, 2011 WL 6034374, at *3 (S.D.N.Y. Dec. 1, 2011) ("Complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." (citation omitted)); *Sudler v. City of New York*, No. 08 Civ. 11389, 2009 WL 2365335, at *3 (S.D.N.Y. July 31, 2009) ("The complaint's entirely conclusory allegations of [a] conspiracy . . . amount to nothing more than bald allegations that all defendants conspired among themselves, which do not suffice under *Twombly*."); *Dunlop v. City of New York*, No. 06 Civ. 0433, 2008 WL 1970002, at *4 (S.D.N.Y. May 6, 2008) ("[P]laintiffs' conspiracy claims must be dismissed pursuant to Rule 12(b)(6) if he has not nudged his claims across the line from conceivable to plausible, by pleading sufficient subsidiary facts in support thereof." (citations, quotation marks, and alterations omitted)).

Thus, as Judge Lynch has explained, "conclusory allegations of conspiracy present exactly the kind of generalized claim that the *Twombly* standard is meant to police."  *Fin. One, Inc. v. Suk Chang*, No. 09 Civ. 4289, 2009 WL 2513504, at *1 (S.D.N.Y. Aug. 17, 2009); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 846 (2013) ("Conclusory allegations of 'participation' in a 'conspiracy' have long been held insufficient to state a claim." (citations omitted)).  Indeed, this Court has recently

looked to *Twombly* for guidance on the pleading standards in a case where the plaintiff alleged, in nebulous terms, a free-floating agreement to violate the law.  *See Gilman v. Marsh & McLennan Companies, Inc.*, 868 F. Supp. 2d 118, 128-29 (S.D.N.Y. 2012); *id.* at \*129 ("Because Plaintiffs do not plausibly allege that Defendants commenced or continued the judicial proceeding against Plaintiffs, the SAC's malicious prosecution claim must be dismissed." (citing *Delince v. City of New York*, No. 10 Civ. 4323, 2011 WL 666347, at \*5 (S.D.N.Y. Feb. 7, 2011) ("On a motion to dismiss a New York malicious prosecution claim, the bare allegation that [one person] acted in concert with [another] is a legal conclusion that does not satisfy *Iqbal* or *Twombly*." (quotation marks omitted))).

Of course, this motion does not actually turn on the presence of a conspiracy.  Rather, it turns on the adequacy of Plaintiffs' allegations that the Union acted in bad faith.  Yet because the Union allegedly did so as a result of, and by means of, a malevolent conspiracy with the Hotel, and because Plaintiffs have not identified any other facts that satisfactorily allege bad faith, the question of bad faith is inextricably bound up with the adequacy of Plaintiffs' allegations that Defendants conspired to harm them.  Just as any allegation of bad faith would have to meet the plausibility showing established by *Twombly* and *Iqbal* if attacked under Rule 12(b)(6), so too must this conspiracy-based account of bad faith surmount that obstacle.

It cannot do so.  Superficially, Plaintiffs appear to allege a host of subsidiary facts in support of their claim.  Yet on closer inspection, none of these facts bears on the existence of a conspiracy between the Union and the Hotel.  Most of these "allegations" consist of little more than a description of conduct that the Court has concluded is otherwise lawful, followed by an entirely conclusory accusation of conspiracy and bad faith.  For example:

> 37.  Upon Information and Belief, The Union and Hotel at the time the [Omnibus Agreement] was executed agreed that they would cooperate to intentionally undermine the agreement by taking

23

> actions to minimize the benefits that were provided to the Banquet Servers by the [Omnibus Agreement].
>
> 38.  While maintaining a total secrecy about the Adour agreement, the Union and the Hotel, working in concert, began to create and/or enhance practices unknown to plaintiffs, and to execute a plan to make the practices permanent in order to effectively order plaintiffs' income and the benefits to which the Arbitration Award and [Omnibus] Agreement entitled them . . . .
>
> 53. The "instruction" to the Hotel was a sham and intentional cover for a practice that the Hotel and the Union had conspired to continue for the express purpose of undermining the [Omnibus] Agreement.

Indeed, Plaintiffs make little effort to allege familiar aspects of a conspiracy, such as who was involved, and when and where these individuals met and conspired.  Plaintiffs allege only that Defendants conspired due to their shared anger in the aftermath of the Omnibus Agreement and that the presence of a conspiracy can be inferred from Defendants' conduct in the period from the Adour Agreement (eight months before the Omnibus Agreement) to the present day. The Complaint alleges no facts that explain why Defendants would have been mutually aggrieved by the Omnibus Agreement, why they would have (or how they did) act in unison to harm Plaintiffs, or how this agreement operated on the ground.  Nor does it explain how Defendants' mutual course of dealing departed from the standard obligations of negotiation and agreement that labor law imposes upon unions and employers.  *See, e.g.*, *O'Neill*, 499 U.S. at 74.

In the absence of subsidiary allegations fleshing out an agreement to retaliate against Plaintiffs, the bare and conclusory allegation that the Union manifested bad faith by conspiring with the Hotel does not rise above *Twombly*'s plausibility threshold.  *Twombly* requires more than a charge that something bad happened and a conclusory allegation that this bad thing was also illegal because it resulted from a malevolent conspiracy.

This conclusion is bolstered by the fact that there is a significantly more plausible account of this course of events: the 2007 Action and Omnibus Agreement addressed a particular course of events arising from an illegal tip pool and failure to comply with an arbitration ruling; separate from that development, or perhaps partly because the Omnibus Agreement raised the cost of using banquet staff, the Hotel sought to decrease the cost of banquet functions by shifting some of those functions to Adour or hotel rooms; and the Union, which represents many groups of employees, maintains long-term relations with the Hotel, and saw no unambiguous rule in the IWA or Omnibus Agreement that governed its obligations, made a reasonable decision not to aggressively and immediately oppose the Hotel's policy preferences.  Indeed, it appears as though Plaintiffs are trying to evade familiar limits on DFR doctrine—including the Union's right to form agreements that disadvantage certain groups of employees and the Union's broad discretion in approaching the grievance process—merely by casting that conduct as union-employer collusion designed to undermine Plaintiffs' amorphous economic expectations about their role in the Hotel.  The danger is that readily conjured allegations of bad faith conspiracy could become a talismanic incantation against motions to dismiss cases that, when tested under *Iqbal* and *Twombly*, should not survive Rule 12(b)(6).

To summarize, the facts that Plaintiffs allege do not state a DFR violation on their own. Plaintiffs can prove such a violation only by alleging plausibly the existence of a conspiracy that infused these otherwise-lawful actions with bad faith.  Yet rather than point to any facts that evidence the existence of such a conspiracy, they essentially allege that it must be inferred from Defendants' course of conduct and their own bare-bones assertion of its reality.  To determine whether this claim surmounts *Twombly*'s plausibility threshold, the Court must look for the sorts of subsidiary facts suggesting that such a bad faith conspiracy may have existed.

Applying that test, Plaintiffs' allegations fail to nudge their claim of a years-long, secret conspiracy by the Union and the Hotel to harm Plaintiffs' labor interests—and to do so by taking steps entirely susceptible of innocent explanation—across the line into plausibility.

### 4.    Conclusion

Plaintiffs' allegations do not survive the "onerous standards of irrationality, unlawfulness or deceit necessary to support a determination that the Union's actions here were arbitrary, discriminatory or taken in bad faith, or that such conduct seriously undermined the arbitral process." *Tucker v. Am. Bldg. Maint.*, 451 F. Supp. 2d 591, 595 (S.D.N.Y. 2006).

Accordingly, Defendants' motions to dismiss the DFR claims must be granted.

### C.    Plaintiffs' Contract Claim

 In the alternative, the Court concludes that Plaintiffs have failed to allege any violation of their contract rights by the Hotel.  For that reason, separate from the inadequacy of Plaintiffs' DFR allegations, all claims against the Hotel must be dismissed.

First, the Adour Agreement was signed eight months before the Omnibus Agreement.  It is therefore impossible for the Adour Agreement to have violated or undermined any legal right that Plaintiffs believe they may have been afforded by the Omnibus Agreement.

Second, even to the extent that the Hotel's alleged concealment of the Adour Agreement and policy of transferring banquet-like functions to hotel rooms might be alleged to violate the Omnibus Agreement, that claim hinges on Plaintiffs' implausible reading of the rights created by the Omnibus Agreement.  Specifically, Plaintiffs rely on the following provision:  "[n]othing in this Omnibus Agreement . . . shall be interpreted to authorize the Hotel to reduce any benefits *currently* received by tipped banquet employees, except as set forth in the Omnibus Agreement or the attached Settlement Agreements."  (emphasis added).  By its plain terms, however, this clause did not create any sort of  absolute protection from any *future* reduction in benefits.  Nor

in context, did the relevant "benefits" include the right to service banquet-like functions held in Adour or hotel rooms.  The Omnibus Agreement was simply silent on those matters; it was not a perpetual guarantee that all *status quo* circumstances would remain unchanged.  To the extent that this language is ambiguous—a doubtful conclusion—examination of the contract as a whole further supports this conclusion.  After all, the Omnibus Agreement is a multi-party contract designed to resolve a large number of specific disputes.  There is little reason to believe that its terms encompass the sweeping meaning that Plaintiffs would force upon it.

The Hotel did not violate any contractual right held by Plaintiffs when it entered into and implemented the Adour Agreement.  Nor did it violate any such rights when it shifted certain functions to hotel rooms.  Accordingly, Plaintiffs cannot state a contract claim against the Hotel.

## IV.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED.  The Clerk of Court is directed to terminate the motion entries at Dkt. Nos. 8 and 13, and to close this case.


SO ORDERED.

Dated:  New York, New York
        June 27, 2013

_____
J. PAUL OETKEN
United States District Judge

27